1  Robert S. Lafferrandre,  OBA#11897
2  Stephen C. Hailey,  OBA#21512
   PIERCE COUCH HENDRICKSON
3   BAYSINGER & GREEN, L.L.P.
   1109 N. Francis
4  Oklahoma City, OK 73106
   405 235-1611
5  405 235-2904 facsimile

6
   *Attorneys for Plaintiff*
7

**FILED**

JUL 3 0 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9                  **(SAN FRANCISCO DIVISION)**

10
   IN RE: BEXTRA AND CELEBREX
11  MARKETING SALES PRACTICES AND            CV  C08:    **3650**
   PRODUCT LIABILITY LITIGATION
12
                                            MDL M:05-cv-1699_____
13
   DOROTHY NEAL SEACAT, individually,        **CIVIL COMPLAINT**
14  and BILLY GENE SEACAT, spouse,
                                            **DEMAND FOR JURY TRIAL**
15              Plaintiffs,
16
17  v.

18  PFIZER, INC., PHARMACIA
   CORPORATION, and G.D. SEARLE LLC,
19  (FKA G.D. SEARLE & CO.),

20              Defendants.
21
22

23                          **COMPLAINT**

24      Dorothy Neal Seacat, individually, and her husband Billy Gene Seacat, Plaintiffs, by and

25  through their undersigned counsel, bring this action for damages against Defendants Pfizer, Inc.,

26  Pharmacia Corporation, and G.D. Searle LLC, (hereinafter referred to as "Defendants"), for
27
28  damages arising from Defendants design, manufacturer, sale, testing, marketing, advertising,

promotions, and/or distributions of the unsafe prescription anti-inflammatory drug with the trade name Bextra.

## SECTION I – PARTIES

1.      Plaintiffs are and were at all relevant times, married and adult residence citizens of the State of Oklahoma.

2.      Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its place of business in New York, New York.   On April 16, 2003 Pfizer, Inc. acquired Pharmacia Corporation ("Pharmacia").  Pharmacia Corporation was held and operated as a wholly owned subsidiary of Pfizer, Inc. and acted as Pfizer's agent and alter ego.  At all relevant times, Pfizer and/or its predecessors in interest engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting and selling the drug Valdecoxid which is marketed under the trade name Bextra in Oklahoma and throughout the United States.

3.      Defendant G.D. Searle LLC ("G. D. Searle").  G. D. Searle is a Delaware limited liability corporation with essential place of business in the state of Illinois.  G. D. Searle is a wholly owned subsidiary of Pharmacia Corporation which is a wholly owned subsidiary of Pfizer.

4.      Defendant Pharmacia Corporation ("Pharmacia") is a Delaware Corporation with its principal place of business in New Jersey.  Pharmacia is a resulting company from the March 31, 2000 merger of Pharmacia and Upjohn with Monsanto Company.  Monsanto changed its name to Pharmacia Corporation. Pharmacia was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Bextra in Oklahoma and throughout the United States.

5.      Bextra is a pharmaceutical drug intended for treatment of musculoskeletal joint pain associated with osteoarthritis, among other maladies.    Pfizer, Pharmacia, and Searle manufactured, designed, packaged, marketing and distributed Bextra.

6.      At all times relevant to this action, Defendants intentionally, recklessly and/or negligently concealed, suppressed, admitted and misrepresented the risk, dangers, defects and disadvantages of Bextra and advertised, promoted, marketed, sold and distributed Bextra as a safe medication when in fact Defendants had reason to know, and did know, that Bextra was not safe for its intended purposes, for the patients for whom it was prescribed, and to whom it was sold.  As a result, Bextra caused serious medical problems and in certain patients catastrophic injuries and death.

7.      In engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other Defendants, or those Defendants predecessors in interest.

## SECTION II –JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the matter pursuant to 28 USCA § 1332.   The amount and controversy exceeds $75,000.00 and there is complete diversity of citizenship between Plaintiffs and Defendants.

9.      The applicable statute of limitations is tolled based on Defendants fraudulent concealment of the dangers and adverse side effects of the drug Bextra, respectively, from Plaintiff as more fully stated herein, which prevented her from discovering the Defendants' wrong doing.  Additionally, for the reasons stated herein, Defendants are equitably estopped from raising the statute of limitations defense.

**SECTION III - MULTI DISTRICT LITIGATION ASSIGNMENT**

10.    Assignment to the Northern District of California, San Francisco Division, is proper pursuant to MDL-1699, pretrial order No. 2 dated December 13, 2005, of this action is related to In Re: Golden, Bextra and Celebrex marketing, sales, practice, and products of liability litigation, MDL-1699, assigned to the Honorable Charles R. Bryer by the judicial panel on multi district litigation on September 6, 2005.

**SECTION IV – FACTUAL BACKGROUND FACTS REGARDING PLAINTIFF**

11.    Plaintiff Dorothy Seacat was prescribed and began taking Bextra on or about April, 2003.

12.    As a direct and proximate result of using Bextra, Plaintiff Dorothy Seacat suffered severe cardiovascular injuries which resulted in her having a severe heart attack in May of 2003 and later requiring the installation and of a pacemaker device. Plaintiff's injuries are permanent and continuing in nature.

13.    Unaware of the risk presented by Bextra, or that Bextra was the cause of her injuries; Plaintiff continued to take Bextra until the time of the heart attack.

14.    Plaintiff exercised reasonable diligence to determine the cause of her heart attack by seeking medical advice.

15.    Plaintiff and Plaintiff's healthcare providers were, at the time of Plaintiff's heart attack and initial injury, unaware and could not have reasonably known or have learned through reasonably diligence that such injury resulted from Plaintiff's ingestion of the prescription drug Bextra. Furthermore, Defendant's negligence and otherwise intentional acts, omissions, and misrepresentations prevented Plaintiff from discovering the cause of her injuries.

16.    Plaintiff used Bextra in a proper and reasonably expected manner. It was used it in a condition that was substantially the same as the condition in which it was manufactured and sold.

17.    Plaintiff would not have used Bextra had Defendant properly disclosed the risk associated with the drug.

18.    Defendant's withdrawal of Bextra from the market happened approximately two years after Plaintiff suffered her heart attack.

19.    Plaintiff did not discover that her heart attack was related to her use of Bextra until April of 2007.

## SECTION V – FACTS REGARDING BEXTRA'S SAFETY AND DEFENDANT'S KNOWLEDGE THEREOF

20.    Bextra is one of a class of pain medications called non-steroidal anti-inflammatory drug ("NSAIDs"). Aspirin, naproxen and ibuprofen are examples of NSAIDs.

21.    NSAIDs reduce pain by blocking the body's production pain transmission enzymes called cyclooxygenase or "COX". There are two forms of COX enzymes, COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes. COX enzymes trigger the subsequential oxidation of various fatty acids to create prostaglandins. Prostaglandins are important in the physiology of plain, igniting hormone like actions in the immediate vicinity of the cells that release them, thereby inducing inflammation, pain and fever.

22.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking COX-1 enzyme, the body's ability to protect gastric tissue is

- 5 -                                                    COMPLAINT

hampered and as a result, can cause gastrointestinal side effects including stomach ulceration and bleeding.

23.     Because COX enzymes and prostaglandins increase the pain associated with tissue injury, the census of prostaglandin by cells of injured tissue become a reasonable target for pain management drugs.

24.     Prostaglandin I-2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilatation and preventing the proliferation of vascular smooth muscle.   Whereas older NSAIDs inhibits Thromboxane A-2 and prostaglandin I-2, the COX-2 inhibitors leave Thromboxane A-2 unaffected.   Thromboxane A-2 unaffected is a potent platelet aggregator and vasoconstrictor, which is symphonized by platelets.   Therefore while the older NSAIDs suppress platelet aggregation and vasoconstriction, the COX-2 inhibitor supported.

25.     Traditional NSAIDs like aspirin reduce inflammation and therefore pain, by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach.   However, traditional NSAIDs do not cause blood clots; rather they actually reduce the risk of clots and help protect heart function.

26.     Defendant and other pharmaceutical companies set out to remedy the ulcer and bleeding problems suffered by some NSAID users by developing "selected" inhibitors that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

27.     In making this decision, Defendant and their predecessors and interest either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin level and causes from Thromboxane A-2 to be uninhibited,

- 6 -                                        COMPLAINT

causing blot clots, and giving rise to various clot related cardiovascular events, including heart attacks, strokes, and unstable angina. The vasoconstriction and flow detention cause the hypertension.

28.     Pfizer launched Celebrex, the first of three major COX-2 inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and consumers of the superiority of their new "block buster" drug over less inexpensive NSAIDs. In May 1999, Merck & Company Inc. ("Merck") launched Vioxx its own selective COX-2 inhibitor.

29.     Seeking increase market share in this extremely lucrative market, Defendants, and their predecessors and interest, often sought approval of a second generation selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the; (1) prevention and treatment of acute pain; (2) treatment of primary dysmenorrhea and; (3) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

30.     The FDA granted approval of the new drug on November 16, 2001, for two particular uses; (1) treatment of primary dismenorrhea and; (2) relief for the signs and symptoms of osteoarthritis and rheumatoid arthritis.

31.     The FDA did not grant approval to market and promote Bextra for the management or prevention of acute pain.

32.     The FDA did not grant approval to promote Bextra as more effective than other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers, or gastric bleeding.

33.     Even without a label that allowed defendant to legitimately claim superior safety, when Defendant, and their predecessors and interest, began marketing Bextra in early 2002, Defendant and their representatives and agents misrepresented the safety profile of Bextra to

- 7 -                                COMPLAINT

consumers including Plaintiff, the medical community, healthcare providers and third-party payers. Defendant proceeded to promote market sale and distribute Bextra as much safer and a more effective pain reliever than other NSAIDs, such as aspirin, naproxen and ibuprofen.

34.     The potential for cardiovascular risk of COX-2 inhibitors was known to Defendant long before FDA granted market approval in November 2, 2001. By 1997 and prior to the submission of the new drug application ("NDA") for Bextra, Defendant was aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacyclin and thromboxane and thereby, increased the prothrombotic effects of the drug, causing blood clots to form in those who ingested it. *See* Topol, E.J., et al., Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, JAMA, August 22, 2001 at 954. Although all COX-2 inhibitors have this mechanism of action, Bextra was most selective inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

35.     Pharmacologist, Dr. Garrett Fitzgerald of the University of Pennsylvania, reported in an editorial published in The New England Journal of Medicine on October 21, 2004, that it was know as early as 1999 that selective COX-2 inhibitors, such as Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vetro, and that it may predispose patients to myocardial infarction or thrombotic stroke.

36.     Nevertheless, on January 16, 2001, Defendants admitted an NDA to the FDA for Bextra, admitting information without the extent of risk associated with Bextra. Without the complete picture of potential hazards associated with the drug, FDA approved Bextra on or about November 16, 2001.

37.    Nevertheless, on January 16, 2001 Defendant submitted an NDA to the FDA for Bextra, omitting information about the extent of the risks associated with Bextra. Without a complete picture of the potential hazards associated with the drug, the FDA approved Bextra on or about November 16, 2001.

38.    Based on the studies performed on Celebrex, Vioxx, Bextra, and other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendant knew when Bextra was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risk for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show that selective COX-2 inhibitors, including Bextra, decreased blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

39.    On December 9, 2004, the FDA issued new information on the side effects associated with the use of Bextra and required the addition of certain warnings to, and the strengthening of other warnings on, the Bextra label. The enhanced warnings followed in the wake of the results of additional cardiovascular studies performed by Defendant, as well as numerous complaints to the FDA regarding severe skin reactions.

40.    Yet, well prior to this warning, Defendant had knowledge of the coronary and cardiovascular safety risk of Bextra from several studies. See e.g., *Otto, E.O., Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing Coronary Artery Bypass Surgery,* The Journal of Thoracic and Cardiovascular Surgery, June 2003 at 1481.

COMPLAINT

41.     Even Defendant's own (and Pfizer funded) post-drug approval meta-analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data showing an increased cardiovascular risk in patients treated with Bextra after undergoing coronary artery bypass graft surgery. Observed events included heart attack, stroke, and blood clots in the legs and lungs. The results were particularly relevant and striking as each of the study participants who were a post-bypass surgery patient were taking anti-clogging agents at the time their exposure to Bextra was being tracked.

42.     In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart attack or stroke.

43.     From February 16-18, 2005, the FDA's Drug Safety and Risk Management Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine the safety of COX-2 inhibitors. There, FDA Office of Drug Safety Officer, David Graham, testified that selective COX-2 inhibitors increased the risk for adverse cardiovascular events at about the same rate as cigarette smoking, hypertension, and diabetes.

44.     Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of Bextra, Defendantd failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Safety and Risk Management Advisory Committee and Arthritis Drug Advisory committee meetings.

45.     On April 7, 2005, the FDA finally insisted that the Defendant "voluntarily withdraw" Bextra from the U.S. market, stating:

- 10 -                                    COMPLAINT

1

2       "...the Agency has concluded that the overall risk verses benefit
        Profile of Bextra is unfavorable.   This conclusion is based on the
        Potential increase risk for serious cardiovascular (CV) adverse events,
3       which appears to be a class effect of non-steroidal anti-inflammatory
        drugs (NSAIDs) (excluding aspirin), an increase risk of serious skin
4       reactions (e.g. toxic epidermal necrolysis, Stevens-Johnson syndrome,
        eythemal multiforme) compared to other NSAIDs and the fact that
5       Bextra has not been shown to offer any unique advantage over the
6       other available NSAIDs."

7       46.     FDA Alert for Healthcare Professionals, April 7, 2005.

8
        Continuing, the FDA noted:
9

10      "Bextra has been demonstrated to be associated with an increased risk
        of serious adverse CV events in two short-term trials in patients
11      immediately post-operative from coronary artery bypass graft (CABG
        surgery....FDA has conducted that it is reasonable to Extrapolate the
12      adverse CV risk information for Bextra from the Short-term CABG
        trials to chronic use given the fact that other COX-2 selective
13      NSAIDs have been shown in long-term controlled clinical trials to be
14      associated with an increased risk of serious adverse CV events (e.g.,
        death, MI, stroke), and the well described risk of serious, and often
15      life-threatening gastrointestinal bleeding....To date, there have been
        no studies that demonstrate an advantage of Bextra over other
16      NSAIDs that might offset the concern about the serious skin risk,
17      such as studies that show a GI safety benefit, better efficacy compared
        to other products, or efficacy in a setting of patients who are
18      refractory to treatment with other products."

19
        47.     The scientific date available during and after Bextra's approval process made
20
        clear to Defendant that their formulation of Bextra would cause a higher risk of blood clots,
21
        stroke and/or myocardial infarctions among Bextra consumers, alerting them to the need to do
22
23      additional and adequate safety studies.

24
        48.     As stated by Dr. Erick Topol on October 21, 2004, in the New England Journal
25
        of Medicine, outlining Defendant's failure to have conducted the necessary trials before
26
        marketing to humans "....it is mandatory to conduct a trial specifically assessing cardiovascular
27
28      risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with

- 11 -                                                                    COMPLAINT

established coronary artery disease, who frequently have coexisting osteoarthritis requiring medicine and have the highest risk of further cardiovascular events."

49.     Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in person who used COX-2 inhibitors.

50.     Based upon readily available scientific data. Defendants knew, or should have known, that their pre-approval testing of Bextra did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take Bextra. Therefore, Defendant's testing and studies were grossly inadequate. See, e.g., PDR entry of Bextra noting that: "Platelets: In four clinical studies with young and elderly (>/=65 years) subjects, single and multiple doses up to 7 mg BID had no effect on platelet aggregation").

51.     Had Defendant done adequate testing prior to approval and "market launch," (rather than the extremely short duration studies done on the small size patient base that was actually done) their scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of Bextra consumers. Adequate testing would have shown that Bextra possessed serious side effects for individuals such as Plaintiff. Defendant should have taken appropriate measures to insure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

52.     In fact, post-market approval data did reveal increased risk of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendant in order for them to gain significant profits from continued Bextra sales.

COMPLAINT

53.    Defendant's failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market. At the time Defendant manufactured, advertised, and distributed Bextra to consumers, Defendant intentionally or recklessly ignored and/or withheld information regarding the increased risks of Hypertension, stroke and/or myocardial infarctions because Defendant knew that if such increased risk were disclosed, consumers such as Plaintiff would not purchase Bextra, but instead would purchase other cheaper and safer NSAIDs.

## CLAIMS FOR RELIEF

### COUNT I
### STRICT PRODUCTS LIABILITY/DEFECTIVE DESIGN

54.    Plaintiff, Dorothy Seacat repeats and re-alleges the allegations of the prior paragraphs as if fully set forth herein.

55.    Pfizer, Pharamacia, and G.D. Searle designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Bextra which it knew would be used by Plaintiff, Dorothy Seacat, and others.

56.    At the time Bextra was manufactured and sold to Plaintiff, Dorothy Seacat, by Pfizer, Pharmacia, and Searle, it was defective in design and unreasonably dangerous, subjecting users to risks of heart attacks, strokes, and other illnesses which exceed the benefits of the products, and for which other safer products were available. This defective condition made the product unreasonably dangerous when put to a reasonably anticipated use as treatment for pain relief, which was the use for which Bextra was advertised.

- 13 -                                                COMPLAINT

57.     Alternatively, when the Bextra products were manufactured and sold to Plaintiff by Pfizer, Pharmacia, and G.D. Searle, the products were defective in design and formulation, making use of the product more dangerous than other drugs for pain relief.

58.     Plaintiff, Dorothy Seacat, used Bextra in a manner reasonably anticipated by the defendants.

59.     The Bextra sold or provided to the Plaintiff reached the Plaintiff without substantial change.

60.     Plaintiff, Dorothy Seacat, was unaware of the dangerous propensities of the product. The Plaintiff ingested the Bextra without making any changes or alterations.

61.     As a direct and proximate result of the defective and dangerous design of the Bextra, Plaintiff, Dorothy Seacat, suffered damages including but not limited to suffering a heart attack and the need for continued medical care.  All such losses are permanent and continuing in nature.

62.     Pfizer, Pharmacia, and Searle's conduct was done with conscious disregard for the safety of users of Bextra, including Plaintiff, Dorothy Seacat, justifying an award of punitive damages.

63.     Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra.  Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT II
## STRICT PRODUCTS LIABILITY/FAILURE TO WARN

64.     Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as if fully set for the herein.

65.    The Bextra manufactured, supplied, and sold by Pfizer, Pharmacia, and G.D. Searle was unaccompanied by proper and adequate warnings regarding all adverse side effects associated with the use of Bextra and the comparative severity and duration of the adverse effects as well as that it was not approved for relief of acute pain and that it did not have any approved gastrointestinal-protective benefit.  The warnings given by Pfizer, Pharmacia, and G.D. Searle did not accurately reflect the symptoms, type, scope, or severity of the side effects.

66.    The Bextra manufactured, supplied and sold by Pfizer, Pharmacia, and G.D. Searle was an unreasonably dangerous defective product which posed unacceptable risks to human health when put to a reasonably anticipated use by Plaintiff, Dorothy Seacat, who was without knowledge of its dangerous characteristics.

67.    Pfizer, Pharmacia, and G.D. Searle failed to perform adequate testing and study of Bextra prior to marketing it or ignored existing data.  Such adequate testing, study or analysis would have shown that Bextra possessed serious life threatening side effects, with respect to which full and proper warnings accurately and fully reflecting symptoms, type of illness, scope and severity should have been given with respect to the use of Bextra.

68.    Pfizer, Pharmacia, and G.D. Searle also failed to act properly on adverse event reports it received about Bextra, failed to properly study Bextra's pre-market as well as post market.

69.    Pfizer, Pharmacia, and G.D. Searle also failed to effectively warn users and physicians that numerous other methods of safer pain relievers were available.

70.    Pfizer, Pharmacia, and G.D. Searle failed to give adequate pre-and post-marketing warnings or instructions for the use of Bextra because after Pfizer, Pharmacia, and G.D. Searle knew or should have known of the risk of injury from Bextra use, Pfizer,

Pharmacia, and G.D. Searle failed to provide adequate warnings to users consumers and continued to aggressively promote the product to doctors, hospitals and directly to consumers.

71.    Plaintiff, Dorothy Seacat, used Bextra in a manner reasonably anticipated by the defendants.

72.    As a direct and proximate result of Pfizer, Pharmacia, and G.D. Searle selling Bextra without adequate warnings, as well as the other conduct mentioned in this Count, Plaintiff, Dorothy Seacat, suffered damages including but not limited to suffering a heart attack and the need for continued medical care. All such losses are permanent and continuing in nature.

73.    Pfizer, Pharmacia, and G.D. Searle's conduct was done with conscious disregard for safety, justifying an award for punitive damages.

74.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT III
## NEGLIGENT DESIGN

75.    Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as it fully set forth herein.

76.    Pfizer, Pharmacia, and G.D. Searle designed, produced, manufactured and injected into the stream of commerce, in the regular course of its business, the pharmaceutical drug Bextra which it knew would be used by Plaintiff, Dorothy Seacat, and others.

77.    At the time the Bextra was manufactured and sold to Plaintiff, Dorothy Seacat, by Pfizer, Pharmacia, and G.D. Searle, it was defective in design and unreasonably dangerous,

- 16 -                                                    COMPLAINT

subjecting users to risk or heart attacks, strokes, blood clots, and other illnesses which exceeded the benefits of the product, and for which other safer products were available.

78.    Alternatively, when the Bextra product was manufactured and sold to the Plaintiff, Dorothy Seacat by Pfizer, Pharmacia, and G.D. Searle, the product was defective in design and formulation, making use of the product more dangerous than other drugs for pain relief.

79.    The Bextra sold to Plaintiff, Dorothy Seacat, reached the Plaintiff without substantial change.

80.    Plaintiff was unaware of the dangerous propensities of the product until well after the use and subsequent stroke. Plaintiff ingested the Bextra without making any changes or alterations.

81.    In designing and manufacturing Bextra, Pfizer, Pharmacia, and G.D. Searle failed to exercise the ordinary care that a careful and prudent manufacturer would exercise in the same or similar circumstances.

82.    As a direct proximate result of the negligent design of Bextra, Plaintiff, Dorothy Seacat suffered damages including but not limited to suffering a heart attack and the need for continued medical care. All such losses are permanent and continuing in nature.

83.    Pfizer, Pharmacia, and G.D. Searle conduct was done with conscious disregard for the safety of users of Bextra, including Plaintiff, Dorothy Seacat.

84.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

COMPLAINT

**COUNT IV**
**NEGLIGENT FAILURE TO WARN**

85.     Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as if fully set forth herein.

86.     Pfizer, Pharmacia, and G.D. Searle owed Plaintiff, Dorothy Seacat, a duty to warn of any dangerous defects or side effects; a duty to assure its product did not cause users unreasonable and dangerous risks, reactions, side effects, and a duty to provide adequate post market surveillance and warnings as it learned of the additional risks posed by Bextra.

87.     Pfizer, Pharmacia, and G.D. Searle breached its duty of reasonable care to Plaintiff, Dorothy Seacat, in that Pfizer, Pharmacia, and G.D. Searle failed to:

    a.     Conduct sufficient testing which, if properly performed, would have shown that Bextra had serious side effects, including heart attacks, strokes, hypertension, atherosclerosis, blood clots, and other serious side effects, and warn users of those risks; and/or

    b.     Include adequate warnings with Bextra that would alert users to the potential risks and serious side effects the drug as well as the limited benefits and the approved uses; and/or

    c.     Warn the Plaintiff, Dorothy Seacat, that use of Bextra carried a risk of death or permanent disability from heart attacks, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

    d.     Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Bextra; and/or

    e.     Provide Plaintiff, Dorothy Seacat, with other appropriate warnings, including but not limited to that Bextra is not approved for acute pain, it had no

- 18 -                                                                 COMPLAINT

proven gastrointestinal-protective effects, it should not be used indefinitely, and patients had to be adequately screened prior to taking Bextra.

88.    Pfizer, Pharmacia, and G.D. Searle should have known that Bextra caused unreasonably dangerous risks and serious side effects to which the general public would not be aware. Pfizer, Pharmacia, and G.D. Searle nevertheless advertised, marketed and promoted its product knowing there were safer methods and products for pain control.

89.    As direct and proximate result of Pfizer, Pharmacia, and G.D. Searle's negligence and breach of its duty of reasonable care, Plaintiff, Dorothy Seacat, suffered damages including but not limited to suffering a heart attack and the need for continued medical care. All such losses are permanent and continuing in nature.

90.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

**COUNT V**
**FRADULENT CONCEALMENT**

91.    Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as it fully set forth herein.

92.    Pfizer, Pharmacia, and G.D. Searle had actual knowledge of the cardiothrombotic effects of Bextra. Despite having knowledge of the cardiothrombotic effects of Bextra, Pfizer, Pharmacia, and G.D. Searle actively concealed and omitted to disclose those effects when marketing Bextra to doctors, health care providers, and to the general public through direct advertisements.

93.     At the time these omissions were made, Pfizer, Pharmacia, and G.D. Searle had knowledge of the substantial and significant cardiothrombotic effects of Bextra.

94.     Pfizer, Pharmacia, and G.D. Searle omitted from Plaintiff, Dorothy Seacat, the true cardiothrombotic and other adverse health effects of Bextra. Pfizer, Pharmacia, and G.D. Searle further downplayed the results of various studies showing the cardiothrombotic effects; it withheld adverse reports or gave incorrect information about the reports it received about the side effects of Bextra such as heart attacks and strokes.

95.     Pfizer, Pharmacia, and G.D. Searle failure to disclose material facts constituted fraudulent concealment. Pfizer, Pharmacia, and G.D. Searle sanctioned approved and/or participated in the failure to disclose.

96.     Pfizer, Pharmacia, and G.D. Searle had a duty to speak because they had superior knowledge regarding the adverse health effects of Bextra as set forth herein.

97.     The information not disclosed by Pfizer, Pharmacia, and G.D. Searle was unavailable to Plaintiff, Dorothy Seacat, and/or her treating healthcare professionals. Pfizer, Pharmacia, and G.D. Searle knew the information was unavailable yet approved and participated in instructing its agents, servants and employees to not disclose the information in order to promote the sales of Bextra over other COX-2 inhibitors as well as any non-steroidal anti-inflammatory such as Ibuprofen and Naproxen.

98.     Plaintiff, Dorothy Seacat, was diligent in attempting to seek the information by consulting with her physicians.

99.     The information not disclosed by Pfizer, Pharmacia, and G.D. Searle was not within the reasonable reach of Plaintiff, Dorothy Seacat, and/or her treating physicians, in the exercise of reasonable care.

100.    The non-disclosed information was material, and Pfizer, Pharmacia, and G.D. Searle knew they were not disclosing complete information and intended that Plaintiff, Dorothy Seacat, and/or her treating physicians act upon the non-disclosed information in the manner reasonably contemplated.

101.    Plaintiff, Dorothy Seacat, and/or her treating physicians were ignorant as to the undisclosed information and had a right to rely on full disclosure.

102.    If Plaintiff, Dorothy Seacat, and/or her treating physician had known the complete information, they would not have prescribed and/or Plaintiff would not have taken Bextra as evidence by Pfizer, Pharmacia, and G.D. Searle being required to include black label warning.

103.    As direct and proximate result of Pfizer, Pharmacia, and G.D. Searle's non-disclosure of information, Plaintiff, Dorothy Seacat, suffered damages including but not limited to suffering a heart attack and the need for continued medical care.  All such losses are permanent and continuing in nature.

104.    Pfizer, Pharmacia, and G.D. Searle's non-disclosure of information was outrageous due to their evil motive and reckless indifference to the rights of Plaintiff, Dorothy Seacat, justifying and award of punitive damages.

105.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra.  Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

**COUNT VI**
**COMMON LAW FRAUD**

106. Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as it fully set forth herein.

107. Pfizer, Pharmacia, and G.D. Searle made false representations and omissions to Plaintiff, Dorothy Seacat, and other members of the public, including but not limited to, that Bextra was safe, had been adequately tested to determine safety, and did not present life-threatening dangers.

108. These representations and omissions, as set for in the above paragraphs, were false. The true facts were that Bextra was not safe, had not been adequately tested, and had dangerous and life-threatening side effects. When Pfizer, Pharmacia, and G.D. Searle made the representations, it knew them to be false, and said representations were made by Pfizer, Pharmacia, and G.D. Searle Pfizer, Pharmacia, and G.D. Searle Pfizer, Pharmacia, and G.D. Searle with the intent to deceive Plaintiff, Dorothy Seacat and/or his prescribing physicians and with the intent to induce Plaintiff, Dorothy Seacat to use the Bextra manufactured by Pfizer, Pharmacia, and G.D. Searle.

109. Plaintiff, Dorothy Seacat, and/or her physicians, reasonably relied upon false representations and omissions; Plaintiff's physicians prescribed Bextra, and Plaintiff used Bextra. Plaintiff would not have done so if he had known the true facts. In using Bextra, Plaintiff, Dorothy Seacat exercised ordinary care.

110. As a direct and proximate result of the aforesaid fraudulent conduct, Pfizer, Pharmacia, and G.D. Searle caused Plaintiff, Dorothy Seacat, to suffer the damages and injuries herein alleged.

- 22 -                                                     COMPLAINT

111.    Pfizer, Pharmacia, and G.D. Searle's conduct was outrageous due to its evil motive or reckless indifference to the rights of Plaintiff, Dorothy Seacat, justifying an award of punitive damages.

112.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

113.    Plaintiff, Dorothy Seacat, repeats, and re-alleges, the allegations of the prior paragraphs as it fully set forth herein.

114.    When Pfizer, Pharmacia, and G.D. Searle placed the Bextra into the stream of commerce. Pfizer, Pharmacia, and G.D. Searle knew of the use for which drug was intended and impliedly warranted to consumers including Plaintiff, Dorothy Seacat, that the use of Bextra was a safe acceptable means of relieving pain and impliedly warranted that the product was of merchantable quality and safe for its intended use.

115.    Plaintiff, Dorothy Seacat, relied upon Pfizer, Pharmacia, and G.D. Searle and its judgment when his purchased and utilized Bextra.

116.    The Bextra was not merchantable quality and was not safe for its intended use because it was unreasonably dangerous and incapable of satisfying the ordinary purpose for which it was intended, and because it caused serious injury to Plaintiff, Dorothy Seacat.

117.    As a direct proximate result of the dangerous and defective condition of Bextra, Plaintiff was injured, and incurred damages in the form of bodily injury and medical expenses. All such losses are permanent and continuing in nature.

- 23 -                                                          COMPLAINT

118.    Plaintiff, Dorothy Seacat, is entitled to recover from Pfizer, Pharmacia, and G.D. Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, loss past and future income and incurred expense.

119.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT VIII
## BREACH OF EXPRESS WARRANTY

120.    Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as it fully set forth herein.

121.    Pfizer, Pharmacia, and G.D. Searle expressly warranted to Plaintiff, Dorothy Seacat, by statements made by Pfizer, Pharmacia, and G.D. Searle or its authorized agents, orally or in written publications, package labels, and/or inserts, that Bextra was safe, effective, fit, and proper for its intended use. The express warranties include, but were not limited to:

a.    Bextra is used in adults for: a. for relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis: and

b.    for the treatment of primary dysmenorrheal.

122.    In utilizing Bextra, Plaintiff, Dorothy Seacat, relied upon the skill, judgment, representations, and express warranties of Pfizer, Pharmacia, and G.D. Searle.

123.    The express warranties and representations made by Pfizer, Pharmacia, and G.D. Searle were false in that Bextra was not safe and was not fit for the use for which it was intended.

- 24 -                                    COMPLAINT

124. As direct and proximate result of the dangerous and defective of Bextra, Plaintiff, Dorothy Seacat, was injured and incurred damages in the form of physical injury and medical expenses. All such losses are permanent and continuing in nature.

125. Plaintiff, Dorothy Seacat, is entitled to recover from Pfizer, Pharmacia, and G.D. Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost and past future income and incurred expenses.

126. Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT IX
## NEGLIGENT MISREPRESENTATION

127. Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as if fully set forth herein.

128. Pfizer, Pharmacia, and G.D. Searle knew, or should have known, that there were dangerous side effects resulting from the ingestion of Bextra.

129. Pfizer, Pharmacia, and G.D. Searle knew or reasonably should have known that consumers such as Plaintiff, Dorothy Seacat, would not have known about the increase risk of heart attack and strokes associated with the ingestion of Bextra.

130. Pfizer, Pharmacia, and G.D. Searle armed with the knowledge stated in the preceding two paragraphs, proceeded with the design, production, manufacturing, promotion, advertising and sale of Bextra without adequate warning of the side effects and dangerous risks to the consuming public including Plaintiff, Dorothy Seacat.

- 25 -                                    COMPLAINT

131. Pfizer, Pharmacia, and G.D. Searle negligently represented to Plaintiff, Dorothy Seacat, the safety and effectiveness of Bextra and concealed material information, including adverse information regarding the safety and effectiveness of Bextra. The misrepresentations and/or material omissions made by or perpetuated by Pfizer, Pharmacia, and G.D. Searle are as follows, Pfizer, Pharmacia, and G.D. Searle failed to:

a. Conduct sufficient testing which, if properly performed, would have shown that Bextra had serious side effects, including heart attacks, strokes, hypertension, arthrosclerosis, blood clots, and other serious side effects, and warn users of those risks; and/or

b. Include adequate warnings with Bextra products that would alert users to the potential risks and serious side effects the drugs as well as the limited benefits and the approved uses; and/or

c. Warn the Plaintiff, Dorothy Seacat, that use of Bextra carried a risk of death or permanent disability from heart attacks, strokes, blood clots, other cardiovascular disorders and other serious side effects; and/or

d. Advise the FDA, the healthcare industry, and the public about the adverse reports it had received regarding Bextra; and/or

e. Provide Plaintiff, Dorothy Seacat, with other appropriate warnings, including but not limited to that Bextra is not approved for acute pain, it had no proven gastrointestinal-protective effects, it should not be identified, and patients had to be adequately screened prior to taking Bextra.

132. Pfizer, Pharmacia, and G.D. Searle made the misrepresentations and omissions with the intent for Plaintiff, Dorothy Seacat, and the consuming public to rely upon such

- 26 -                                    COMPLAINT

information or the absence of such information in section of Bextra as a treatment for pain relief.

133.    Plaintiff, Dorothy Seacat, justifiably relied on and/or induced by the misrepresentation and/or active concealment by Pfizer, Pharmacia, and G.D. Searle and she relied upon the absence of safety information which Pfizer, Pharmacia, and G.D. Searle suppressed, concealed, or failed to disclose all to Plaintiff's detriment.

134.    As a direct and proximate result of the dangerous and defective condition of Bextra Plaintiff, Dorothy Seacat, was injured and incurred damages in the form of physical injury and medical expenses. All such losses are permanent and continuing in nature.

135.    Plaintiff, Dorothy Seacat, is entitled to recover from Pfizer, Pharmacia, and G.D. Searle for all damages caused by the defective product including, but not limited to, damages for pain, suffering, loss of the capacity to enjoy life, lost past and future income, and occurred expenses.

136.    Plaintiff's spouse, Billy Seacat, sustained a loss of consortium as a result of the injuries and damages sustained by Plaintiff incident to her use of Bextra. Plaintiff's spouse's damages include, but are not limited to, a loss of society, companionship, services, support, and care. All such losses are permanent and continuing in nature.

## COUNT X
## CONCERT OF ACTION

137.    Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations of the prior paragraphs as if fully set forth herein.

138.    Pfizer, Pharmacia, and G.D. Searle continue to profit from their scheme, concert of action by withholding information from Plaintiff, Dorothy Seacat, the consuming public, the FDA, and/or the healthcare industry.

- 27 -                                                    COMPLAINT

139. Defendants Pfizer, Pharmacia, and G.D. Searle acted in concert of action to promote the use of Bextra to individual doctors, hospitals and/or to the general public, knowingly misrepresenting Bextra as safe. In doing so, they engaged in tortuous conduct by failing to disclose and/or affirmatively misrepresenting the safety of Bextra with regard to heart attacks, strokes, and other cardiovascular events in order to obtain the FDA approval of Bextra and/or to promote the sale and distribution of Bextra to individuals including the Plaintiff, Dorothy Seacat, herein, acting in concert of action with each other. These actions included providing samples to doctors, hospitals, entering into formulary agreements, etc., and/or providing misleading and false material representations and omitting to disclose material facts as alleged herein.

140. Defendants Pfizer, Pharmacia, and G.D. Searle actively pursued a common plan or scheme to design, promote, advertise, distribute and sell Bextra for their individual financial gain and benefit by willfully and fraudulently misrepresenting and/or concealing and/or intentionally failing to disclose material facts to the FDA, Plaintiff, Dorothy Seacat's treating physicians, healthcare providers and/or to the general public about the risks and dangers of Bextra.

141. Defendants Pfizer, Pharmacia, and G.D. Searle advanced this common intent, plan, scheme and purpose by : (1) failing to inform Plaintiff, Dorothy Seacat, Plaintiff's treating physicians, healthcare providers, the FDA and/or the general public, of the cardiothrombotic and other adverse health effects of Bextra, and/or (2) intentionally downplaying, misinterpreting, and/or engaging in the intentional omission of information regarding the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Bextra; and that the FDA did not approve it for treatment of acute pain based on its

- 28 -                                                    COMPLAINT

pre-approved submission to the FDA; and/or (3) withholding adverse reports and/or giving incorrect information about the reports they receive about the side effects of Bextra such as heart attacks, strokes and blood clots to Plaintiff and Plaintiff's treating physician, healthcare providers, the FDA, and the general public; and/or (4) engaging in a pattern and conduct of actively misrepresenting, concealing, and/or omitting to disclose these effects when marketing and promoting Bextra through direct consumer advertising and marketing to Plaintiff, Plaintiff's treating physicians, healthcare providers and/or the general public.

142. Defendants Pfizer, Pharmacia, and G.D. Searle misrepresentations of material facts as described herein constitute fraudulent concealment in furtherance of the concert of action.

143. Each of the Defendants Pfizer, Pharmacia, and G.D. Searle sanctioned, approved and/or participated in misrepresenting material facts to the FDA, Plaintiff, Dorothy Seacat and/or Plaintiff's treating physicians and healthcare providers and/or failed to disclose/omitted material facts to the FDA Plaintiff, Plaintiff's treating physicians and healthcare providers and to the general public in connection with the common purpose or scheme to promote, advertise, distribute and profit, each of them, from the sale of Bextra to Plaintiff and the general public.

144. Each of the Defendants Pfizer, Pharmacia, and G.D. Searle knew their conduct, as described above, as well as the conduct of all the defendants, jointly and severely, constituted a breach of duty owed Plaintiff, Dorothy Seacat, yet gave substantial assistance and/or encouragement to the others to carry out Defendants' common plan or scheme, and/or to promote, advertise, distribute and profit from the sale of Bextra to Plaintiff and the general public, which in turn was a substantial factor in causing or contributing to cause Plaintiff's personal injuries and actual damages in the amount to be proved at trial.

145. Defendants Pfizer, Pharmacia, and G.D. Searle's conduct, as described herein, knowing of the dangers and risks of Bextra, yet fully concealing and/or omitting to tell the FDA Plaintiff, Dorothy Seacat, and/or Plaintiff's treating physicians of these material facts, in furtherance of their concert of action was outrageous of Defendants' evil motive or reckless indifference to the safety of users of Bextra, including Plaintiff.

## COUNT XI
## CONSPIRACY

146. Plaintiff, Dorothy Seacat, repeats and re-alleges the allegations in the preceding paragraphs as it fully set forth herein. Plaintiff, Dorothy Seacat, further alleges that all wrongdoings alleged in the preceding counts was done in conspiracy with defendants Pfizer, Pharmacia, and G.D. Searle, and that each defendant did acts in furtherance of the conspiracy alleged herein.

147. Defendants Pfizer, Pharmacia, and G.D. Searle, each of them, reached a meeting of the minds regarding the common plan or scheme and actively pursued a common plan or scheme to design, promote, advertise, distribute and sell Bextra for their individual financial gains and benefit by willfully and fraudulently misrepresenting and/or concealing and/or intentionally failing to disclose material facts to Plaintiff, Dorothy Seacat, Plaintiff's treating physicians, health care providers and to the general public about the risks and dangers of Bextra.

148. Defendants Pfizer, Pharmacia, and G.D. Searle, and each of them, in one or more of the following ways, advanced this common intent, plan, scheme and purpose by: (1) failing to inform Plaintiff, Dorothy Seacat, Plaintiff's treating physicians, health care providers, the FDA and/or the general public, of the true cardiothrombotic and other adverse health effects of Bextra; and/or (2) intentionally downplaying, misinterpreting, and/or engaging in the intentional

omission of information regarding the results of various studies showing the cardiothrombotic effects and explaining the cardiothrombotic effects of Bextra; and that the FDA did not approve it for treatment of acute pain based on its pre-approved submission to the FDA; and/or (3) withholding adverse reports and/or giving incorrect information about the reports they received about the side effects of Bextra such as heart attacks, strokes and blood clots to Plaintiff and Plaintiff's treating physicians, healthcare providers, the FDA, and the general public; and/or (4) engaging in a pattern and conduct of actively misrepresenting, concealing, and/or omitting to disclose these effects when marketing and promoting Bextra direct to consumer advertising and marketing to Plaintiff, Plaintiff's treating physician, healthcare providers and/or general public.

149. Defendants Pfizer, Pharmacia, and G.D. Searle's misrepresentation of material facts as described herein, constituted fraudulent misrepresentations and defendants Pfizer, Pharmacia, and G.D. Searle failure to disclose material facts, as described herein, constituted fraudulent concealment in furtherance of the conspiracy which occurred in part, in the city of Oklahoma City, State of Oklahoma.

150. Each of the Defendants Pfizer, Pharmacia, and G.D. Searle participated in misrepresenting material facts to Plaintiff, Dorothy Seacat, and/or Plaintiff's treating physicians and healthcare providers and/or failed to disclose or omitted material facts to Plaintiff, Plaintiff's treating physicians and healthcare providers and to the general public in connection with the common purpose or scheme to promote, advertise, distribute, and each of them profit from the sale of Bextra to Plaintiff and the general public.

151. As a result of the conspiracy of the Defendants Pfizer, Pharmacia, and G.D. Searle, as described above, Plaintiff, Dorothy Seacat, sustained personal injuries and actual monetary damages in an amount to be proved at trial.

- 31 -                                                              COMPLAINT

152.    Defendants Pfizer, Pharmacia, and G.D. Searle conduct, as described herein, knowing of the dangers and risks of Bextra, yet fraudulently misrepresented and/or concealed and/or omitted telling Plaintiff, Dorothy Seacat, and/or Plaintiff's treating physicians of these material facts, was outrageous because of Defendants' evil motive or reckless indifference to the safety of users of Bextra, including Plaintiff.

WHEREFORE, each Plaintiff demands judgments in their favor against Defendants Pfizer, Pharmacia, and G.D. Searle, jointly, severally and for common liability for:

A. A fair and just amount of actual damage in an amount to be proved at trial;

B. Cost of suit;

C. Pre-judgment and post-judgment interest;

D. Punitive damages and exemplary in a fair and reasonable amount to punish and deter Defendants and others from engaging in the wrongful conduct; and

E. Such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims in this complaint.

1     Respectfully submitted, July 28, 2008,

2

3
                                    By: _____
4

5                                   Robert S. Lafferrandre, OBA# 11897
                                    Stephen C. Hailey, OBA#21512
6                                   PIERCE COUCH HENDRICKSON
                                       BAYSINGER & GREEN, L.L.P.
7                                   1109 N. Francis
                                    Oklahoma City, OK 73106
8                                   405 235-1611
9                                   405 235-2904 facsimile

10                                  *Attorneys for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        - 33 -                    COMPLAINT